The TRAVELERS INDEMNITY CO., Plaintiff,

v.

AMR SERVICES CORP., Defendant.

AMR SERVICES CORP., Third–Party Plaintiff,

v.

SCAC TRANSPORT (USA), INC., Third–Party Defendant.

No. 91 Civ. 1311 (BN).

United States District Court, S.D. New York.

March 14, 1996.

Bigham Englar Jones & Houston, Karin A. Schlosser, New York City, for defendant and third-party plaintiff.

Richard K. Bernstein Associates, P.C., Richard K. Bernstein, New York City, for third-party defendant.

### OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting as a United States District Court judge by designation: [1]

#### INTRODUCTION

This is a diversity action within the purview of 28 U.S.C. § 1332(a)(1) commenced by The Travelers Indemnity Co. ("Travelers"), an insurance carrier and subrogee of its insured, Horizon Associates, New York ("Horizon"), against AMR Services Corp. ("AMR"). Travelers sued AMR to recover damages in the sum of $160,833.23, representing the value of the insured goods stolen while stored in AMR's customs bonded warehouse. Travelers' action against AMR was settled for $113,000 and dismissed.

Currently before the court for final disposition is AMR's third-party complaint against SCAC Transport (USA), Inc. ("SCAC"), which action seeks indemnification for AMR's $113,000 settlement payment to Travelers, or in the alternative, for all damages in excess of $9,923.72 (representing the contractual cap on AMR's "freight liability"), plus costs and attorneys fees.

Upon consent of the parties, and with the permission of the court, the third-party action has in lieu of a bench trial in open court been submitted for decision and judgment on the following record: an Agreed Statement of Facts, deposition testimony, and documentary exhibits appended to the parties' memoranda of law. The parties, nonetheless, still have the requisite burdens of proof on specific issues.

With regard to choice of law, there is no dispute that New York law applies.

For the following reasons, the third-party complaint is dismissed.

#### THE FACTS

The record comprises: the parties' Agreed Statement of Facts; affidavits of Stanley G. Gerold ("Gerold"), AMR's Operations Supervisor for the customs bonded warehouse from which the goods were stolen, and Karin A. Schlosser, counsel for the third-party plaintiff, to which affidavits are appended various supporting documentary exhibits; the depositions of Gerold, Peter A. Bernacki ("Bernacki"), SCAC's Vice President, Joseph Castellano ("Castellano"), Senior Supervisor of Security Experts, Inc. ("SEI"), and Ugister Mulahoo ("Mulahoo"), an employee of SEI.

The facts are:

SCAC is a clearing agent for international shipments arriving at JFK International Airport, New York ("JFK") for SCAC's French affiliate, an air freight forwarder in Paris, France, SCAC Transport International Air Service ("SCAC Air Service"). At the pertinent period of time, SCAC leased cargo storage space, and hence was a tenant, in Cargo Building No. 75 at JFK, also known as the Helmar Building ("Building 75").

---

1. This action was reassigned to the writer from Judge Allen G. Schwartz on September 20, 1995.

Under a contract dated November 11, 1988, effective retroactively as of September 1, 1988 ("cargo handling contract"), SCAC engaged AMR as its "sole cargo handling agent" (Agreed Statement of Facts, par. 8) at Building No. 75, which agent performed ground handling services for international cargo on behalf of SCAC and in such capacity operated the storage facility leased by SCAC in Building No. 75 as AMR's "Container Station Annex," and as a customs bonded warehouse.[2]

Under the cargo handling contract, AMR performed the "hands-on" control and management functions related to cargo handling services at the Building 75 facility on behalf of SCAC. Appended to, and part of, the cargo handling contract is a special attachment denominated as "Exhibit JFK," dated September 1, 1988, covering the specific "ground handling" services AMR contractually agreed to perform as agent of SCAC at JFK.

Of pivotal concern in this case is clause 2 of the cargo handling contract, an indemnifying agreement. Also of significance in the cargo handling contract for purposes of this litigation is clause 3 of the appended "Exhibit JFK" providing for a limitation or cap on AMR's "freight liability." The disputes between the parties arising out of the indemnification and freight liability limitation clauses are discussed *infra*.

A shipment of 43 cartons of leather goods having a value of $160,833.23 was consigned by Ideal Cuir ("Cuir"), Paris, France, to Horizon. Cuir delivered the goods to its air freight forwarder SCAC Air Service for carriage by air *via* Trans World Airlines ("TWA") to New York and delivery to the consignee Horizon.

■ SCAC Air Service issued its air waybill No. 591962, dated June 14, 1989,[3] naming as clearing agent at JFK third-party defendant, SCAC. That air waybill made no reference to limited liability pursuant to the Warsaw Convention, a Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000–3026 (1934), TS No. 876, 137 L.N.T.S. 11, *reprinted* at 49 U.S.C. § 1502 (1976), adopted in 1929 ("Warsaw Convention"). However, in lieu the Warsaw limitation of liability, the air waybill contained SCAC Air Service's own contractual limitation of liability, discussed *infra*.

The shipment of leather goods was consolidated by SCAC Air Service and transferred to TWA for transportation from France to JFK. Upon arrival at JFK on Friday, June 16, 1989, AMR's trucker picked up the shipment (subsequently found to be one piece short) and delivered the 42 cartons to Cargo Building No. 75, wherein the goods were stored in a locked cage located inside AMR's Container Station Annex, part of AMR's customs bonded warehouse operations at JFK.

On Monday, June 20, 1989, when Sarcona Trucking came to the warehouse to pick up the goods for delivery to the consignee, they could not be found. As previously mentioned and discussed *infra*, the 42 cartons had been stolen from the warehouse.

Travelers paid its insured, Horizon, the value of the goods, $160,833.23, and thereafter, in 1991, as Horizon's subrogee, com-

---

**2.** The genesis of the SCAC/AMR relationship at Building No. 75 appears to be as follows: At the time SCAC leased the warehouse space in Building 75, AMR already operated a cargo container station licensed and bonded by customs. Rather than take the time-consuming steps to apply for its own customs license and bond for its warehouse space, SCAC opted to engage AMR, whose container station was licensed and bonded, to operate the SCAC warehouse facility. AMR obtained from customs an extension of its bond to cover the facility leased by SCAC, thus making such facility AMR's Container Station Annex and customs bonded warehouse.

**3.** An "air waybill" is essentially a contract of carriage and may contain a limitation of the

carrier's liability, such as that provided by the Warsaw Convention, a Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000–3026, TS No. 876, 137 L.N.T.S. 11, *reprinted* at 49 U.S.C. § 1502, adopted in 1929. The United States became an adhering nation in 1934. 78 Cong. Rec. 11582; 49 Stat. 3013. *See Denby v. Seaboard World Airlines, Inc.*, 575 F.Supp. 1134 (E.D.N.Y.1983), *rev'd on other grounds*, 737 F.2d 172 (2d Cir.1984). However, it is undisputed in this case that the air waybill for the subject leather goods made no reference to the Warsaw Convention limitation of liability.

menced this action against only AMR to recover damages for the loss of the goods.[4] Travelers' action against AMR was settled and dismissed in March 1995 upon AMR's payment to Travelers of $113,000, after giving notice to SCAC. AMR impleaded SCAC by third-party complaint. SCAC has consistently disclaimed any liability to AMR for the theft of the goods.

At the time warehouse space in Building No. 75 was leased by SCAC, apparently the storage facility provided no central alarm system. Although not required by the terms of the cargo handling contract, SCAC arranged for the installation of a central alarm system for the warehouse, for certain related security services, and for installation of a "high-value" security cage inside the warehouse, which cage was locked with a keyed padlock and monitored by a motion detection system. The cargo handling contract does not expressly impose, and is completely silent with respect to, any duties or obligations on either party regarding security at the warehouse.

Further, although not required to do so by the cargo handling contract, AMR arranged for its already existing U.S. Customs Bond to extend to SCAC's storage facility in Building No. 75, and to operate such facility as AMR's bonded Container Station Annex. As previously disclosed, Gerold was AMR's Operations Supervisor at the warehouse at the time of the theft of the goods (and through April, 1992), and is a pivotal actor in this case.

Regarding security, prior to the date of the cargo handling contract, November 11, 1988, but following the retroactive effective date of that contract, September 1, 1988, SCAC entered into a "CONTRACT FOR BURGLAR ALARM," dated October 12, 1988, with SEI, an independent security company. Under that contract, SEI agreed to install, maintain, monitor, and generally take charge of the security services at the warehouse, including a central alarm system, armed patrol and response. The contract scheduled the installation of a central alarm system to commence on October 10, 1988. It is stressed that during its contract with SEI, SCAC assumed no supervision or control over SEI in the installation, maintenance, or monitoring of the security system. Indeed, under the contract, SCAC was expressly prohibited from disturbing or interfering with the alarm and from permitting anyone else (other than SEI, of course) to do so.

A critical feature of the security system at the warehouse was the central alarm system. So far as pertinent, the alarm system operated as follows:

Upon entry into or exiting from the warehouse, the alarm was disarmed and rearmed by pressing numbers on a pressure-sensitive keypad located outside the building. For such purpose, authorized employees each had a numbered personal user code. SCAC's Vice President, Bernacki, informed SEI of the employees who had been designated to have personal user code numbers, including AMR employees.

According to Bernacki's March 30, 1994 deposition, p. 50, Gerold's June 30, 1991 deposition, p. 22–23, and Castellano's March 26, 1992 deposition, p. 20, authorized employees selected a personal user code number and in the presence of an SEI employee who put the system in a "program mode," the number selected by the employee was electronically programmed into the alarm system. Gerold was authorized to have an access code. Bernacki and his manager at SCAC also had user codes, "purely as an emergency" and "backup." Bernacki dep., p. 51. Additionally, authorized persons, including Gerold, were issued a key by Bernacki to open the padlock on the high value security cage.

The purpose of a user code was to permit authorized access to the building, and to identify the specific employee entering and exiting the building. Upon entries to and exits from the warehouse, code numbers were electronically recorded along with the date and time.

---

**4.** As recently observed by the New York Court of Appeals, "subrogation is the principle by which an insurer, having paid losses of its insured, is placed in the position of its insured so that it may recover from the third party legally responsible for the loss." *Winkelmann v. Excelsior Ins. Co.,* 85 N.Y.2d 577, 581, 626 N.Y.S.2d 994, 650 N.E.2d 841 (1995).

Neither SCAC nor SEI were responsible for conducting background checks on persons authorized by AMR to access the warehouse. Further, SCAC had no internal security standards for the warehouse since "we [SCAC] weren't concerned with the warehouse [security] then," Bernacki dep., p. 69, since "customs approved the facility under AMR's bond." Bernacki dep., p. 92.

In December 1988, at the direction of and with the approval of Andre D'Apice, AMR's manager at the warehouse, Gerold gave his user code (number 4) and cage key to a fellow employee, Jose Camacho, on two occasions when Gerold took vacation days on December 14th and December 30th, 1988. Upon returning from his vacations, Gerold's cage key was received from Camacho. Prior to the theft, SCAC was never informed by Gerold or otherwise learned that Gerold had given his user code and key to Camacho.

Upon Gerold's return from his vacation (apparently the second) in December 1988, without notice to SCAC he changed his user code directly through SEI's employee Mulahoo and requested that the latter delete Gerold's former number from the system. Mulahoo came to the warehouse and programmed Gerold's change of user code into the system. According to Mulahoo, when Gerold's code number was changed, Gerold's former code number should have been automatically erased from the system. Mulahoo Deposition., p. 7–9. Inexplicably, however, Gerold's prior code number was not erased from the system, and as discussed *infra,* the prior number was used by an unidentified person or persons to access the building at the time of the theft.

There is no evidence that after requesting deletion of his former code number, Gerold endeavored to confirm whether his prior code number was actually removed from the system. Further, there is no evidence that prior to the theft either SCAC or SEI received any complaint from AMR or was otherwise put on notice of any defect or malfunctioning of the alarm system. In changing his code number Gerold concededly dealt directly with Mulahoo at SEI and did not go through SCAC or give the latter any notice of his action.

According to SEI's records, on June 16, 1989 the warehouse was closed at 17:52 hours by "user number 6." Shortly thereafter, at 17:55 hours, the warehouse was opened by "user number 4." The warehouse remained open for fourteen minutes and was again closed at 18:09 hours by "user number 4." There was no forcible entry into the warehouse or the security cage, and the parties agree that entry into the warehouse was accomplished by someone using Gerold's former user code number 4. On June 19, 1989, upon the arrival of Sarcona Trucking to pick up the shipment for delivery to the consignee, the 42 cartons of leather garments were discovered to have been removed from the security cage.

According to Gerold, shortly after the warehouse closed on June 16, 1989, he observed Camacho "lingering outside the premises of the Building." Agreed Statement of Facts, par. 20. However, D'Apice reported that an AMR employee Daron Black was asked if he saw anything unusual on the night of the theft and Black reported that Camacho was "waiting outside the building for a ride." Affidavit of Karin A. Schlosser, Exh. G. The latter report was denied by Camacho. Thus, while there were suspicions by Gerold implicating his fellow employee Camacho in the theft, there is no indication in the papers that following extensive investigation of by the parties, SEI, insurance carriers, Port Authority Police, and the FBI, that Camacho or any other person was charged. Moreover, there is no evidence of any claim on an employee fidelity bond. This court need not make any finding or determination as to the identity of the person or persons committing the theft, as such identity is not material to the decision in this case.

### DISCUSSION

### I.

AMR, which alone was sued by and settled with Travelers, interposes a third-party complaint alleging, *inter alia,* that AMR, as agent of SCAC, should be indemnified for its settlement of Travelers' suit.

The court first considers AMR's argument that the court should grant it implied, equitable or common law indemnity, at least to the extent of its loss in excess of AMR's limited freight liability under the cargo handling agreement, approximately $9,932.72. The alleged predicate for AMR's claim for implied indemnification is that the theft of the goods was the sole proximate result of SCAC's negligent security at the warehouse, and thus the ultimate loss for such theft should fall on SCAC, the party at fault, and not AMR.

SCAC denies that any direct or independent negligence on its part caused the loss and disclaims liability based on any negligence of SEI, relying on the independent contractor status of the security company. SCAC further maintains that AMR should not be indemnified because the theft resulted from Gerold's negligence in giving his user code and cage key to a fellow employee, and thus AMR itself was completely at fault.

■ The right of one party to shift the entire loss to another through indemnification may be based not only on an express contract, but also an obligation implied by law, sometimes referred to as common law indemnification. Implied or common law indemnification is based on "principles of equity or fairness recognizing that one who was compelled to pay for the wrong of another should be allowed to recover from the actual wrongdoer the damages paid to the injured party." *Trustees of Columbia University v. Mitchell/Giurgola Assocs.,* 492 N.Y.S.2d 371, 374, 109 A.D.2d 449 (1st Dept.1985), citing *McDermott v. New York,* 50 N.Y.2d 211, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980). *See also Mauro v. McCrindle,* 419 N.Y.S.2d 710, 70 A.D.2d 77 (2d Dept.1979), *stay denied,* 49 N.Y.2d 802, *aff'd* 52 N.Y.2d 719, 436 N.Y.S.2d 273, 417 N.E.2d 567 (1980); *Magwood v. Jewish Hospital & Medical Center,* 408 N.Y.S.2d 983, 96 Misc.2d 251 (Kings Cty.Sup. Ct.1978).

■ To recover indemnification of its loss to Travelers for the alleged negligence of SCAC, AMR had to allege and prove that SCAC owed a duty to the primary plaintiff (*viz.,* Travelers as subrogee of its insured), and that such duty was breached. *Kemron Environmental Services, Inc. v. Environmental Compliance, Inc.,* 585 N.Y.S.2d 475, 184 A.D.2d 755 (2d Dept.1992).[5]

■ For the existence of a legal duty on SCAC to provide security, AMR cites *Jacobs v. Helmsley–Spear, Inc.,* 469 N.Y.S.2d 555, 121 Misc.2d 910 (N.Y.C.Civ.Ct.1983), a personal injury action by a tenant against the landlord for a robbery committed against the tenant by a third person. There, the court found that the landlord had breached its duty to protect the tenant from foreseeable dangers by failure to repair an electronic door lock on the premises. In holding the landlord liable to its tenant for the robbery committed by a third person, the court found the landlord's failure to repair the door lock to be a breach of duty to the tenant and the proximate cause of the robbery. Thus, it appears that to establish a duty on SCAC, AMR relies on the well established duty of a landlord of a residential building to protect its tenants against foreseeable dangers (*i.e.,* criminal acts of third persons) by providing proper security at the premises.

For the existence of a duty owed by SCAC to provide security, AMR also relies on *Klein v. Actors and Directors Lab.,* 464 N.Y.S.2d 759, 95 A.D.2d 757 (1st Dept.1983). In *Klein,* also a personal injury action, the court held that a lessor out of possession who had a duty under the covenant of the lease to repair defects and maintain the premises in a

5. It is noted that in SCAC's answer to the third-party complaint, SCAC asserted the statute of limitations and contributory negligence as the Fifth and Sixth affirmative defenses to AMR's negligence claim, presumably on the theory that AMR's negligence claim sounded in tort. AMR's legal memoranda are ambiguous as to whether the claim of negligent security at the warehouse sounds in tort, breach of contract, or implied indemnification, or all of the foregoing legal theories for relief.

The court will address indemnification and also what appears to be AMR's additional theory of SCAC's liability, not well articulated in the third-party complaint or memoranda of law, that SCAC breached an implied contractual duty to AMR under the cargo handling contract to provide proper security at the warehouse.

Accordingly, the court need not consider SCAC's statute of limitations defense for a tort action, which in any event is not argued in the briefs.

reasonably safe condition, also owed such duty to a third person (who was not the tenant), and thus was liable for a sexual assault on the third person that was the proximate result of the lessor's failure to perform the covenant of the lease.

Since in the current case there is neither a landlord-tenant relationship or breach of covenant by a landlord under a lease, neither *Jacobs* or *Klein* have any applicability to whether in the context of their cargo handling arrangement at the warehouse SCAC had a legal duty to provide security at the warehouse.

Obviously, the cargo handling contract did not create a landlord-tenant relationship or contain a covenant to maintain or make repairs at the premises. Indeed, SCAC itself was a tenant in Building No. 75. Clearly, it was AMR as SCAC's ground handler and bonded warehouse operator that assumed responsibility to shippers and/or their consignees (and customs) for proper security of the goods. AMR had its own staff on the premises, including an on-site manager (Mr. D'Apice) and an Operations Manager (Mr. Gerold), followed its own internal security procedures and in essence assumed virtually complete "hands on" control over the cargo handling operations at the warehouse.

■ Citing *Jacobs*, 469 N.Y.S.2d at 557, AMR also relies on the well established rule pertaining to duty: "When one voluntarily assumes the performance of a duty, he is required to perform it carefully, not omitting to do what an ordinary prudent person would do in accomplishing the task." Thus, AMR contends that by voluntarily installing a security system at the warehouse, SCAC thereby assumed a duty to properly maintain the alarm system, which malfunctioned due to SCAC's negligence. The court disagrees.

Under its contract with SEI, following installation of the alarm system the obligations of SCAC included only paying a monthly maintenance fee for a term of one year, and from year to year thereafter (cancelable on thirty days notice prior to the expiration date), holding SEI harmless and indemnifying it for claims and liabilities, procuring liability insurance, and not disturbing or interfering with the alarm system.

Although voluntarily engaging SEI and *installing* the security system, SCAC never assumed any responsibility for the monitoring, maintenance or repair of the security alarm system, and under its burglar alarm agreement with SCAC, SEI was fully responsible for those duties. Indeed, as previously mentioned, SCAC was expressly prohibited by its contract with SEI from disturbing or interfering with the alarm system.

Moreover, the relationship between SCAC and SEI—as manifested by their contract and its implementation—did not even contemplate regular active oversight or supervision by SCAC of SEI's performance of its duties. In point of fact, when Gerold changed his user code, *he dealt directly with SEI's Mulahoo*. The fact that Bernacki had initially designated himself to have a user code for emergencies does not indicate any continuing active participation in, oversight, or control over the operation and maintenance of the security system by SCAC. As previously pointed up, Gerold gave Camacho his user code and key, and subsequently changed his user code, without any notice to Bernacki.

The court holds that under the foregoing facts and circumstances, by voluntarily engaging SEI for installation of the security system, SCAC assumed only implied duties to have selected a competent contractor and to comply with SCAC's monthly financial obligation to pay SEI for the security services to be performed by the latter under their contract. With regard to the former, there is not a scintilla of evidence to suggest that at the time SCAC engaged SEI, SCAC knew or was on notice in the first instance that it had "obviously employed an incompetent security service," as contended by AMR (Mem. at 12).

■ Even assuming *arguendo* that the court could find that by having voluntarily installed the alarm system, SCAC thereby also voluntarily assumed a duty to operate and maintain the system, such implied duties would not be as a guarantor of flawless performance, but at most a duty to exercise ordinary prudence or reasonable care under the circumstances. In that regard, the court

finds no breach of duty, and hence, no negligence by SCAC.

The central alarm at the warehouse was a highly sophisticated electronic security system, the proper implementation of which was dependent largely on the personal input and programming of user codes by the authorized AMR employee and maintaining appropriate confidentially with respect to such personal user codes. Neither SCAC nor SEI had any legal or contractual duty or authority to supervise AMR's employees with regard to their own handling of security matters, and therefore, neither SCAC nor SEI should bear any responsibility for the possible repercussions of Gerold's sharing his code and key with a fellow employee.

According to Mulahoo's deposition, at 9, when changes in codes were programmed into the system by the user, former code numbers should have automatically been deleted. Prior to the theft, neither SCAC nor SEI had any actual or constructive notice of malfunctioning of the alarm system's automatic deletion of codes, and the system's failure to delete Gerold's former code cannot be attributed to a negligent disregard of Gerold's instructions. Indeed, if, as testified by Mulahoo, the system was designed to *automatically* delete Gerold's former user number after he changed to a new code number, it would seem that Gerold's instruction to Mulahoo to delete his former code was superfluous. In any event, at no point in time prior to the theft incident on June 16, 1989, six months after Gerold changed his code, did either SCAC or SEI receive a single complaint from AMR regarding the alleged deficiencies in security at the warehouse. *Cf. Del Signore v. Pyramid Security Services, Inc.,* 537 N.Y.S.2d 640, 147 A.D.2d 759 (3d Dept.1989). Accordingly, the court finds no independent negligence on the part of SCAC regarding the security system.

■ Regarding AMR's claim that SCAC should bear vicarious liability for negligence of SEI, even assuming such negligence, security was properly delegable to an independent contractor, *Del Signore,* 537 N.Y.S.2d at 642, for whose negligent acts or omissions SCAC would not ordinarily have any vicarious liability. Also, and on the same basis, the court finds no breach of any implied contractual duty owed to AMR with regard to the failure of the alarm system to automatically delete Gerold's former user code at the time he changed his code number some six months prior to the theft.

In sum, the court sees no basis in the record for finding either independent or vicarious liability for negligence on the part of SCAC. On the other hand, AMR obviously was not without serious fault in its own internal security practices which permitted Gerold to share his user code and key with a fellow employee. Accordingly, AMR's claim for equitable or implied indemnity must be rejected. In *Trustees of Columbia University, supra* (citing *Rock v. Reed–Prentice,* 39 N.Y.2d 34, 382 N.Y.S.2d 720, 346 N.E.2d 520 (1976)), the court held: "Since the predicate of common law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee, it follows that a party who had itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine." *Id.* 492 N.Y.S.2d at 375.

## II.

■ Next, we address AMR's claim that SCAC is contractually bound to indemnify AMR in accordance with clause 2 of the cargo handling contract. SCAC contends that AMR should not be granted relief under that claim because the indemnification agreement expressly covers only *damage* to property, not *loss* of property. AMR responds that the issue is one of contract construction and the intent of the parties.

The starting point for contract construction is, of course, the express language of the contract, in this case an indemnifying agreement found in clause 2 of the cargo handling contract. In the lengthy and highly detailed indemnifying provision, the parties agreed, so far as pertinent, that they would "defend, indemnify and hold harmless each other * * * from and against any and all claims, liabilities, *loss damages,* costs, attorneys fees or expense which either may hereinafter *incur, suffer or be required to pay by reason of damage to property* * * * arising out of the

performance or nonperformance by either of the services provided hereunder, including those attributable in whole or in part to the negligence of either party * * * but excluding those attributable in whole or in part to the gross negligence of either party * * *." (Emphasis added.)

As the basis of indemnification for liability arising out of the loss of goods (by theft), AMR focuses on the words "loss damages" in clause 2 and quibbles over the alleged omission of a comma between the two words. In essence, AMR argues that "the parties intended to provide indemnification for both loss *and* damages, and failed to include the comma in error." Third-party pltf. Supp. Mem., p. 5.

SCAC correctly observes that whether or not a comma was inadvertently omitted between "loss" and "damages" is a nonissue since the terms are qualified by and must be read together with the language, "by reason of damage to property." Accordingly, argues SCAC, contractual indemnification is due AMR only if the leather goods suffered "damage" in the sense they were physically injured, *i.e.*, by water damage, not lost or stolen. In essence, then, SCAC reads clause 2 as providing indemnification in the event there is a loss (meaning financial loss) by reason of physical damage to property. The court completely agrees with that construction of the clause.

The term "damage" or "damages" read in isolation may have different interpretations or connotations, but the sense in which it is intended to be used by the parties to a contract may frequently be obvious simply from the context in which the term is used. As aptly pointed out by then Chief Judge Weinstein in *Denby v. Seaboard Airlines, Inc.*, 575 F.Supp. 1134, 1139 (E.C.N.Y.1983), *rev'd on other grounds*, 737 F.2d 172 (2d Cir.1984), "damage is used interchangeably in American speech and law to refer both to *monetary loss* and *physical damage.*" Emphasis added.

Under clause 2, in the context of "claims, liabilities, loss damages, costs, attorney's fees or expenses," it is obvious that even if a comma were inserted and read as "loss, damages," etc. as claimed by AMR, in the partic-

ular context the term "loss" means *monetary* loss (not loss of property) and "damages" refers to *monetary* damages (not physical damage to property). On the other hand, it is clear that in the context of the subsequent reference in clause 2 to "by reason of damage to property," the term "damage" is used in its ordinary sense of physical damage or injury to property. Thus, construing the two phrases together and clause 2 as a whole, the clause provides indemnification for financial "loss" or "damages" by reason of physical damage to property.

Hence, while the meaning of the terms "loss" or "damages" may be ambiguous when read in isolation, their intended meaning in clause 2 is very clear from the particular contexts in which the terms appear and a reading of the clause as a whole. *Cf. St. Paul Ins. Co. of Illinois v. Venezuelan Intern. Airways, Inc.*, 807 F.2d 1543, 1549 (11th Cir.1987) (under an air waybill "damage" should mean only "physical damage"). Therefore, the court agrees with SCAC that AMR's "loss" or "damages" (*i.e.*, payment to Travelers of $113,000) was not incurred "by reason of damage to property."

Additionally, SCAC relies on the well-established distinction in the transportation industry of "loss" of goods and "damage" to goods, citing *Schwimmer v. Air France*, 384 N.Y.S.2d 658, 87 Misc.2d 147 (N.Y.C.Civ.Ct. 1976) ("damage is damage and loss is loss"), which case was cited and followed by the Second Circuit Court of Appeals in *Denby v. Seaboard World Airlines, Inc.*, 737 F.2d. 172, 186 (2d Cir.1984), wherein Judge Friendly observed that "it does much less violence to the language to say that 'loss' means all kinds of loss and that damages means only physical damage." Relative to the application of the terms at issue in the freight transportation trade, SCAC also cites to Interstate Commerce Commission regulation 49 C.F.R. § 1005.1, establishing different time-frame standards for the disposition of claims for loss, damage, injury or delay.

In the context of goods that are "damaged" while stored in a customs bonded warehouse, the precise situation here, *Black's Law Dictionary*, Revised Fourth Ed., 1968,

p. 466, defines "damaged goods" as "Goods, subject to duties, which have received *some injury* either in the voyage home or while bonded in a warehouse." Emphasis added. *Black's*, p. 466 also defines "damaged" as "Made less valuable, less useful, or less desirable," which definition excludes a total diminution of value due to the goods becoming nonexistent through loss. The *Black's* dictionary definition of "damage," *id.* at 466, cited by AMR nowhere mentions loss caused by theft or conversion, but rather: "The harm, detriment, or loss sustained *by reason of an injury.*" Emphasis added.

That the term "damage" or "damaged" was clearly intended by AMR to refer to physical damage and not to goods lost or stolen is also evident from the very use of the terms in the list of Cargo Handling duties set forth in Exhibit I of the Exh. JFK. For example:

AMR had a duty to "[n]otify customer of *damaged cargo* upon *receipt of cargo* from shipper." (Emphasis added.) Obviously, if cargo is lost or stolen in transit, AMR could not give notice to the customer "upon receipt of cargo."

Exhibit I also provides, with reference to imported cargo, "[i]t shall be the sole and exclusive obligation of AMRS [AMR] to check the condition of each *arriving shipment.* If the *shipment is damaged* it shall *not be accepted,* except upon the request of SCAC." (Emphasis added.) Plainly, if a shipment was lost or stolen in transit, it could not arrive to be accepted by AMR.

Further, under Exhibit I, AMR had a duty to "[n]otify the Customer of complaints and claims made by the Customer's clients, and handle *lost,* found and *damaged* cargo mat-

ters, as mutually agreed." This is further evidence of an intent by AMR to distinguish between lost and damaged cargo.

■■■■ Finally, absent an express unequivocal provision to the contrary in an indemnification agreement, such agreement generally will not be construed to indemnify against the indemnitee's own negligence. *Morgan v. Good Humor Corp.*, 386 N.Y.S.2d 888, 54 A.D.2d 560 (2nd Dept.1976). Contracts indemnifying a party against its own negligence are generally disfavored and are strictly construed against the drafter. *Quintel Corp., N.V. v. Citibank, N.A.*, 596 F.Supp. 797 (S.D.N.Y.1984). Thus, indemnification clauses, such as that involved here, expressly agreeing to indemnify against "any and all claims," etc., "including those attributable in whole or in part to the negligence [except gross negligence] of either party," are subject to strict construction rather than expansive application.[6] A contract of indemnification must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed. *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989). If the parties to the cargo handling contract intended to be indemnified for theft of goods (even if attributable wholly to negligence), such scope of indemnification obviously was not unequivocally spelled out simply by the phrase "by reason of damage to property."[7]

### III.

■■■ AMR also argues that because of the ground handler at JFK, negotiated the cargo handling contract with SCAC, including clause 2, it is obvious that AMR was cognizant of its exposure to claims by and liability to third persons for theft losses at JFK, but nonetheless agreed to indemnification covering claims and losses only for personal injury and property damage. As aptly pointed out by counsel for SCAC, at least from the standpoint of SCAC, limitation of indemnification for personal injury and property damage was logical since SCAC had no control whatever over the operation at its facility of AMR's customs bonded warehouse and the possible theft of goods therefrom.

---

**6.** Neither party contends that the theft was the proximate result of the other party's "gross negligence."

**7.** As early as 1983, in the District Court's *Denby* decision, Chief Judge Weinstein took judicial notice of "the steadily increasing incidence of cargo thefts at Kennedy and other international airports." The court went on to observe: "A large proportion of such thefts, like the one in case a hand, are organized by airline or airport employees." *Id.*, 575 F.Supp. at 1142–43.

In 1988, when AMR, an operator of a customs bonded warehouse and highly experienced

limitation of freight liability [8] and the particular relationship of the parties under the cargo handling contract, SCAC Air Service's omission of the customary Warsaw Convention limitation of liability in its air waybill constituted a breach by SCAC of its "fiduciary duty" owed to AMR. Citing *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980), citing *Kirke LaShelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (1933), for the rule that an implied covenant of good faith "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement," AMR further posits that the omission of the limitation of liability in the air waybill also constitutes breach of an implied duty of good faith and fair dealing owed by SCAC to AMR. *See also Zilg v. Prentice–Hall, Inc.*, 717 F.2d 671 (2d Cir.1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984).

Inasmuch as both AMR's claim of breach of fiduciary duty and claim of breach of an implied covenant of good faith dealing revolve around the omission from the air waybill of the Warsaw Convention's limitation of liability, those claims although based on distinct legal theories will be discussed together as essentially the same cause of action.

The Warsaw Convention for Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000–3026 (1934), T.S. No. 876, 137 L.N.T.S. 11, *reprinted* at 49 U.S.C. § 1502 (1976). was adopted in 1929. The United States became an adhering nation in 1934. 78 Cong.Rec. 11582, 49 Stat. 3013. *See Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243, 277, 104 S.Ct. 1776, 1795, 80 L.Ed.2d 273 (1984); *Denby*, 575 F.Supp. at 1137. Clause 22(2) of the Warsaw Convention limits the carrier's liability to 250 francs or 17 SDR per kilo, which at the pertinent period of time corresponded to a $20.00 per kilo limitation of liability. Carriers' standard limitation of liability for international carriage reads: "Carriage hereunder is subject to the rules and limitations relating to liability established by the Warsaw Convention unless such carriage is not 'international carriage' as defined by that Convention."

■ Citing to *Royal Ins. v. Amerford Air Cargo*, 654 F.Supp. 679, 681–82 (S.D.N.Y. 1987), AMR insists that it was an agent of the freight forwarder (SCAC Air Service), and had the air waybill included the customary Warsaw Convention limitation of liability,[9] both SCAC and AMR as agents of the freight forwarder (treated as a "carrier") would likewise have been protected by such limitation of liability in the air waybill.

AMR further contends that because the limitation of freight liability included in the cargo handling contract corresponds to the Warsaw Convention limitation of liability, the omission of the Warsaw limitation from the

---

**8.** Clause 3 of Exhibit JFK appended to the cargo handling contract provides:

> 3. *Freight Liability*
> Paragraph 2 of the Agreement dated August 1, 1988 notwithstanding, AMRS [AMR] hereby accepts freight liability for up to $20.00 per kilo or up to $2,000 per occurrence.

**9.** IATA (International Air Traffic Association) air waybills limit the liability of carriers (and their agents) by the following language: "Carriage hereunder is subject to the rules and limitations relating to liability established by the Warsaw Convention unless such carriage is not 'international carriage' as defined by that Convention."

While there is no evidence before the court establishing standard industry practice regarding IATA carriers' air waybill limitations of liability, AMR's contentions in that regard and Air Service's nonconformance with standard industry practice in the case of the subject air waybill are not disputed by SCAC. In any event, even assuming that inclusion of the Warsaw Convention limitation of liability in air waybills were standard industry practice by IATA carriers, there is no reference whatever in the cargo handling contract to any limitation of liability to third persons. Absent any reference in the contract itself to third person liability arising out the performance of the contract, there is simply no provision into which the standard industry practice respecting inclusion of liability limitation in air waybills may be implied.

In other words, the meaning of an ambiguous provision on a particular subject may be interpreted in light of well recognized standard industry practice, if proven, but industry practice cannot be used to add to or expand upon a parties' express obligations under their agreements. To prevent that from occurring, that is one of the purposes of a merger clause, such as clause 8 of the cargo handling contract that makes the provisions of such contract "the complete, final an exclusive agreement between [the parties] concerning its subject matter."

air waybill "completely negated and nullified the benefit of limited liability that AMR had bargained for [with SCAC under the cargo handling agreement]." Third-party plaintiff's Mem., p. 8 and Reply Mem., p. 6. Stated differently, AMR reasons that notwithstanding its limited freight liability to SCAC under the cargo handling contract of $20.00 per kilo corresponds to and is based upon the Warsaw Convention's limitation of liability under Clause 22(2), the limitation of liability contained in the cargo handling contract, but omitted from the air waybill, was not binding on third persons—thus exposing AMR to unlimited liability to third persons.[10]

AMR maintains that SCAC Air Service (which used the IATA logo on the face of its air waybill, giving the impression that it was an IATA air carrier), "act[ed] in bad faith deliberately taking away a bargained for advantage of the Ground Handling Agreement" (third-party pltf.'s supp. mem., p. 11) by using the IATA logo while omitting the organization's standard IATA air carrier's Warsaw Convention limitation of liability from the air waybill.[11]

In sum, AMR contends that at time it entered into the cargo handling contract limiting its freight liability to SCAC, it intended and had a good faith expectation that AMR's liability to third persons would be similarly limited in accordance with the Warsaw Convention by the customary terms imprinted on the carriers' air waybill. By omission of such terms in the air waybill, SCAC breached its fiduciary duty to AMR and its covenant of good faith dealing implied by the limitation of freight liability under the cargo handling contract.

Even assuming that AMR, acting as SCAC's cargo handling agent and warehouseman, would have been afforded limited liability to third persons by inclusion of the Warsaw Convention limitation of liability in the air waybill, no legal authority has been called to the court's attention establishing that the limitation of SCAC's freight liability under the cargo handling contract created a fiduciary relationship or implied obligation on SCAC with regard to the contents of the air waybill. There is no evidence that in issuing air waybills, the French corporation acted as SCAC's alter ego or agent or otherwise was under the control of SCAC.

Moreover, there is no evidence that prior to or contemporaneously with the execution of the cargo handling contract there was any discussion between the parties or conduct by SCAC that remotely implies SCAC intended to assume a fiduciary duty or obligation of good faith to complement AMR's limited freight liability under the cargo handling contract with limited liability to third persons under the air waybill. Rather, with regard to AMR's liability exposure to third persons arising out of performance of the cargo handling agreement, the parties bargained for an obviously detailed mutual indemnifying agreement under which AMR would be held harmless against third person claims arising out of personal injury or damage to property, including even claims attributable wholly to negligence.

## IV.

While air waybill No. 591962 issued by SCAC Air Service concededly did not mention the Warsaw Convention limitation of liability, SCAC stresses that the air waybill did in fact contain a 4500 franc per carton or 50.000 franc ($10,000) per shipment limitation of liability, which AMR could have, but failed, to raise in defense of Travelers' suit against AMR. Therefore, argues SCAC, AMR having failed to interpose the limitation of liability provision under the air waybill to Travelers' claim, AMR should now be held estopped

---

10. According to AMR, in this case its potential limited liability to SCAC pursuant to the cargo handling agreement was $42 \times 11.8K \times $20.00 or $9,923.72, whereas its potential unlimited exposure—without a Warsaw Convention limitation of liability—was $160,833.23, the full value of the cargo.

11. AMR argues that inclusion of the Warsaw limitation of liability is standard practice by IATA carriers, and that the use of the IATA logo on SCAC Air Service's air waybill led AMR to erroneously assume there was an inclusion of the standard Warsaw Convention limitation of liability in SCAC Air Service's air waybill. AMR, however, has not advanced any claim against SCAC either for fraudulent use of the IATA logo or for negligent misrepresentation as to inclusion of the limitation of liability in the air waybill.

to claim over by way of indemnification against SCAC.

AMR contends that it could not have legitimately raised the limitation of liability contained in the air waybill because it would have fixed a lower limit of liability ($10,000) than that permitted by the Convention ($14,162.79) and therefore, was legally null and void under Article 23 of the Convention.[12]

In view of the result reached herein, the court need not decide the validity of the limitation of liability in the air waybill, or whether or not the limitation of liability in the air waybill might have been successfully raised against Travelers by AMR, or the estoppel issue.

## CONCLUSION

For the reasons expressed above, SCAC has no liability to AMR for indemnification, implied or contractual, or for breach of fiduciary duty or an implied covenant of good faith dealing under the cargo handling contract. The third-party complaint is dismissed, and the Clerk is directed to enter a judgment accordingly.

12. AMR did raise the Warsaw Convention limitation of liability in defense of Traveler suit, but that argument was rejected by Judge Conboy because of the absence in the air waybill of any mention of the Warsaw Convention.